UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

JANE DOE,

                       Plaintiff,

      -against-

JOSHUA JACKSON, individually,
DEGUENE KEITA, individually,
FATOUMATA KEITA a/k/a NAOMI KEITA, individually,
JEOFFREY JANVIER, individually and
JOHN DOE, individually.

                 Defendants.
-----------------------------------------------------------------------X

Civil Action No.
23-cv-4910

**COMPLAINT**

Plaintiff Demands a Trial
By Jury

Plaintiff, JANE DOE, (hereinafter referred to as "Plaintiff" or "DOE"), by and through Plaintiff's attorneys, DEREK SMITH LAW GROUP, PLLC, as and for Plaintiff's Complaint in this action against the Defendants, JOSHUA JACKSON (hereinafter referred to as "JACKSON" and/or Defendant), DEGUENE KEITA (hereinafter referred to as "DK" and/or Defendant), FATOUMATA KEITA a/k/a NAOMI KEITA (hereinafter referred to as "FK" and/or Defendant), JEOFFREY JANVIER (hereinafter referred to as "JANVIER" and/or Defendant) and JOHN DOE (hereinafter referred to as "DOE" and/or Defendant) respectfully alleges as follows upon information and belief:

**PRELIMINARY STATEMENT**

1.     This is a case wherein Defendant JOSHUA JACKSON, a professional basketball player who played in the NBA during the times relevant to this lawsuit, met Plaintiff, a young woman, over a night of dinner, drinks and club-hopping during a 2022 Super Bowl afterparty

thrown and hosted by other NBA players in Manhattan. Defendant JACKSON, later the same night, convinced Plaintiff to come to his hotel room offering her $1,500 to "pull up" and sending an Uber Black car service to pick her up from her apartment and bring her back to his hotel room at the New York Edition Hotel, wherein he attempted to convince her to engage in sexual activity with the promise of money, and after she declined his offer, he violently raped and sexually assaulted her.

2.      After Plaintiff confronted Defendant JACKSON about the rape and sexual assault, he falsely accused her of theft and sent co-Defendants to commit a home-invasion robbery of Plaintiff's apartment and caused the other codefendants to harass and intimidate Plaintiff via text message and social media in an attempt to intimidate, threaten and silence her.

3.      Defendant JACKSON, within hours after brutally raping Plaintiff, sent "goons" to harass and threaten Plaintiff via text message and to break-in to and rob Plaintiff's apartment while she was home and to threaten her with murder. Defendant JACKSON's accomplices and accessories, his co-Defendants herein threatened Plaintiff's life, assaulted and robbed her inside her apartment and in her apartment building.   Even after two of Defendant JACKSON's accomplices were arrested for the home-invasion robbery, Defendant JACKSON's accomplices and accessories continued a campaign of harassment and intimidation via text message and on social media to try silence Plaintiff from speaking out regarding the rape.

## NATURE OF THE CLAIMS

4.      Defendants violated Plaintiff's rights pursuant to, *inter alia* 18 U.S.C. §§1591, 1595, 1961 and 1962 and Plaintiff also seeks remedy under state causes of action based upon the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, seeking declaratory and injunctive relief and damages to redress the injuries that Plaintiff has suffered as a result of, *inter*

*alia*, rape, assault and battery, sexual assault and intentional infliction of emotional distress. This is a civil action for damages under the Federal sex trafficking statutes, 18 U.S.C. §§1591, 1595, and the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C.§§ 1961, 1962 as well as the applicable common law and statutes of the state of New York, arising from Defendant JACKSON's rape, sexual assault and sexual battery of Plaintiff, JANE DOE, in New York, New York, and afterwards, sending co-Defendants acting at his behest to intimidate, and break into Plaintiff's apartment to rob her, threaten to murder her and to cause her bodily harm, therein together committing multiple felonies.

5.      Defendant JOSHUA JACKSON, a professional athlete who, at the time played for the Sacramento Kings NBA team, and resides in Detroit Michigan, recruited, and enticed a young woman who resided in New York City, New York, Plaintiff JANE DOE, while he was visiting New York, New York, with the promise of spending time together and valuable goods and services, knowing that he would use means of force, fraud or coercion to rape her and cause her to engage in sex acts in his hotel room.

6.      Defendant, JOSHUA JACKSON participated in these acts knowing, or in reckless disregard of the fact, that he would use force, fraud, or coercion to engage this young female in sexual activity. After Defendant JACKSON raped and sexually assaulted Plaintiff, he falsely accused her of theft and sent co-Defendants DEGUENE KEITA and FATOUMATA KEITA a/k/a NAOMI KEITA to commit a home-invasion robbery of Plaintiff's apartment, and also causing others including co-Defendants JEOFFREY JANVIER, and JOHN DOE to harass and intimidate Plaintiff via text message and social media in an attempt to silence her within hours after Defendant JACKSON brutally raped Plaintiff in his hotel room.

**JURISDICTION AND VENUE**

7.     Jurisdiction of this action is conferred upon this Court as this case involves a Federal Question. The Court also has jurisdiction pursuant 28 U.S.C. §1331, and pendent jurisdiction thereto, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

8.     Additionally, this Court has supplemental jurisdiction over the State law causes of action asserted in this action.

9.     Venue is proper in that acts or omissions giving rise to the claims arose within the Southern District of New York, and Plaintiff's claims arise out of actions undertaken by Defendant JACKSON by assaulting and raping Plaintiff DOE in New York, New York within the Southern District of New York, and actions subsequently taken by Defendant Jackson's co-Defendants in New York, New York within the Southern District of New York.

10.     On January 24, 2023 Defendant Jackson, through counsel agreed in writing to toll all applicable statutes of limitations with respect to claims against Defendant JACKSON.

11.     Thus, this action is timely filed with respect to all claims asserted herein.

**PARTIES**

12.     At all times material, Plaintiff DOE was and is an individual woman who resides in the State of New York.

13.     At all times material, Defendant JOSHUA JACKSON (hereinafter referred to as "DEFENDANT" and/or "JACKSON" and/or "JOSHUA JACKSON") was and is a citizen and resident of the State of Michigan and a professional basketball player.

14.     At all times material, Defendant DEGUENE KEITA (hereinafter referred to as "DEGUENE" or "DEFENDANT") was and is a citizen and resident of the State of New York.

15.     At all times material, Defendant FATOUMATA KEITA a/k/a NAOMI KEITA (hereinafter referred to as "NAOMI" or "DEFENDANT") was and is a citizen and resident of the State of New York.

16.     At all times material, Defendant JEOFFRY JANVIER (hereinafter referred to as "JANVIER" or "DEFENDANT") was and is a citizen and resident of the State of New York.

17.     At all times material, Defendant JOHN DOE (hereinafter referred to as "DOE" or "DEFENDANT") was and is a citizen and resident of the State of New York.

18.     This court has subject matter jurisdiction pursuant to 28 U.S.C §1331 as this action arises under the law of the United States.

19.     This court is an appropriate district court of the United States in accordance with 28 U.S.C. §1331, §1367.

## FACTUAL ALLEGATIONS

20.     On the evening of February 13, 2022, Defendant JACKSON met Plaintiff at a Super Bowl afterparty hosted and attended by members of the Brooklyn Nets NBA team.

21.     Plaintiff, along with Defendant JACKSON, Defendants NAOMI and DEGEUNE, and several other individuals, including members of the Brooklyn Nets NBA team, and Nets' player Andre Drummond, who was hosting the party with Defendant JANVIER, and several others, partied and club-hopped to several nightclubs and lounges in New York City, starting with dinner and drinks at the lounge/restaurant, Sei Less, then the nightclub/restaurants Harbor NYC, and Pergola, all in Manhattan.

22.     Plaintiff went to the party with an acquaintance she met on a social networking site, named Debbie Torres.

23.     Torres went to Plaintiff's apartment, and they departed together to the party.

5

24.     Plaintiff went to the party in hopes of meeting Andre Drummond in person, who Plaintiff had a romantic interest in and who had invited her to the party.

25.     Torres expressed to Plaintiff interest in attending the party so she could meet and network with NBA players to hopefully cultivate business opportunities and advance her professional aspiration to be personal chef for professional athletes.

26.     Early in the evening Plaintiff misplaced her phone and asked several attendees, including Defendant JACKSON to call her number, so that she could try to locate her phone.

27.     Plaintiff was able to locate her phone after sharing her phone number with several of the partygoers, including Defendant JACKSON.

28.     Plaintiff shared an Uber with several other people including Defendant JACKSON after dinner to go to one of two other nightclubs the party attended that evening.

29.     The partygoers, including Plaintiff had been consuming alcoholic beverages throughout the evening.

30.     After Plaintiff went home, Defendant JACKSON sent a text message to Plaintiff telling her to "COME THROUGH" around 2:50 a.m. on the morning of February 14, 2022.

31.     Defendant JACKSON told Plaintiff, "I GOT $1500 FOR YOU IF YOU PULL UP." Plaintiff was under the impression that there was still a party and that party attendees had gathered in Defendant JACKSON's room.

32.     At 2:57 a.m. Defendant JACKSON sent an Uber Black to Plaintiff DOE's apartment building to bring Plaintiff to Defendant JACKSON's hotel.

33.     At around 3:15 a.m., Plaintiff arrived at Defendant JACKSON's hotel, the New York Edition Hotel.

34.     Defendant JACKSON was in Room 2503 and Plaintiff went to his room in hopes to continue to party with him and other NBA players including Drummond.

35.     Plaintiff knocked on Defendant JACKSON's door and Defendant JACKSON opened it, he was shirtless and only wearing basketball shorts.

36.     Plaintiff immediately realized that there was no one else was in the room with Defendant JACKSON, he was only wearing basketball shorts and that there was no party.

37.     Plaintiff told Defendant JACKSON before entering the room, "HEY, DON'T GET THE WRONG IDEA. I AM JUST HERE TO CHILL AND TO BE FRIENDS. DO NOT EXPECT SEX, I AM NOT THAT TYPE OF GIRL."

38.     Plaintiff asked Defendant JACKSON, "WHY DID YOU OFFER ME $1500?"

39.     Defendant JACKSON replied, "YOU ARE BEAUTIFUL. I HAVE BEEN WATCHING YOU ALL NIGHT, YOU WERE THE MOST ATTRACTIVE GIRL THERE TONIGHT."

40.     Attempting to impress Plaintiff, Defendant JACKSON told Plaintiff to look at his mobile banking app on his phone and said, "I HAVE $12 MILLION DOLLARS IN MY BANK ACCOUNT."

41.     Plaintiff informed Defendant JACKSON again that she was not there for the money. "I AM NOT HERE FOR YOUR MONEY. I AM NOT A GOLD DIGGER. I DID NOT EVEN KNOW WHO YOU WERE, I ONLY KNOW OF SOMEONE YOU WERE WITH TONIGHT."

42.     Defendant JACKSON told Plaintiff, "I HAVE SEX WITH GIRLS, AND I USE MY MONEY TO HELP ME GET THEM" (or words to that effect).

43.     Plaintiff responded, "I WOULD NEVER DO THAT." To which Defendant JACKSON commented, "YOU ARE MISSNG OUT."

44.     Plaintiff who was exhausted and recovering from drinking at the party earlier in the evening, laid down on the other side of the bed, with her back facing Defendant JACKSON.

45.     Defendant JACKSON made a point to allow Plaintiff to observe that he was messaging multiple women on Instagram.

46.     Plaintiff fell asleep on the bed.

47.     Later Plaintiff awakened to Defendant JACKSON ripping and pulling her clothes off and climbing on top of her.

48.     Defendant JACKSON ripped open Plaintiff's clothing, exposed his erect penis and forced himself on top of Plaintiff.

49.     Plaintiff cried out, "NO!"

50.     Plaintiff shoved Defendant JACKSON's penis and tried to push it away as he tried to penetrate her vaginally.

51.     Defendant JACKSON overpowered Plaintiff and held down both of Plaintiff's hands as he penetrated her vagina with his penis and raped her.

52.     Plaintiff cried while Defendant JACKSON raped her on the bed in his hotel room.

53.     Plaintiff fainted, passing out from the trauma, confusion, and horror of the rape.

54.     Plaintiff awoke a few hours later around 8:00 a.m. and noticed sunlight outside.

55.     Plaintiff started to edge to the side of the bed to try to escape when Defendant JACKSON placed his hand on her breasts and nipples and started to climb back on top of Plaintiff.

56.     Plaintiff, recalling what happened earlier in the hotel bed, horrified and reeling from the violent rape saw Defendant JACKSON smiling as he looked at Plaintiff.

57.     Plaintiff was able to break free and hurriedly put her clothes back on even though her clothes were torn and damaged from when Defendant JACKSON ripped them off her before he raped her earlier.

58.     Plaintiff looked around the room on the floor and in the bed for a used condom or a condom wrapper fearing that Defendant JACKSON had likely ejaculated inside of her while he raped her and that he could have impregnated her.

59.     Plaintiff screamed to Defendant JACKSON, "WHY DID YOU DO THAT TO ME?! DID YOU USE A CONDOM?! AM I GOING TO BE PREGNANT?!"

60.     Defendant JACKSON replied coldly, "WAIT NINE MONTHS AND FIND OUT."

61.     Plaintiff was completely confused, terrified and in shock, she yelled, "YOU NEED TO BUY ME A PLAN B![1]"

62.     Defendant JACKSON aggressively told DOE, "SHUT UP AND LOWER YOUR VOICE OR I WILL CALL SECURITY."

63.     Plaintiff, who felt terrified and threatened, hoped that hotel security or a housekeeper would hear the commotion so she could report the sexual assault and rape.

64.     Defendant JACKSON told Plaintiff, "YOU NEED TO GET THE FUCK OUT OF HERE AND GO CATCH THAT UBER I JUST CALLED."

65.     Plaintiff feared that if she got in an Uber that Defendant JACKSON arranged that she may not get home safely.

66.     While still in the hotel room preparing to leave, Defendant JACKSON made a phone call to an unknown individual and said to that person, "SHE WILL NOT FUCKING LEAVE MY ROOM!"

---

[1] Morning-after contraception pill.

67.     Plaintiff ran out of the hotel room and left the hotel.

68.     Plaintiff bought a Plan B from the pharmacy and took a train home to shower to wash the filth off her.

69.     By around 10:03 a.m., Plaintiff began receiving threatening texts from Defendant JANVIER falsely accusing her of stealing a watch from Defendant JACKSON's room.

70.     Defendant JANVIER texted Plaintiff, "HEY [Plaintiff]! U DON'T NO WHO THIS IS BUT I'M TRYING TO FACILITATE THIS SITUATION WITHOUT IT ESCALATING TO ANY THING FURTHER! THEY NO U AND WHERE U WORK AND ETC AND THEY ARE GETTING AUTHORITIES INVOLVED SO I AM HOPING U WILL COME TO YOUR SENSES AND GIVE BACK THE WATCH!"

71.     Plaintiff responded by explaining that she did not know anything about any missing watch.

72.     Plaintiff had never seen any purported watch owned or possessed by Defendant JACKSON at any point while she was in his hotel room.

73.     Defendant JANVIER continued, "IT'S GONNA GET SERIOUS U NO THEY GOT MONEY TO BLOW AND HIRE GOONS FOR Y'A I DON'T THINK U WANT THOSE PROBLEMS SO LET'S FIGURE THIS OUT AND ALL THEY WANT IS THE WATCH BACK AND NO ISSUES!"

74.     Defendant JANVIER continued texting: "BEFORE THEY GO TO UR PLACES OF WORK AND FROM UR IG NUMBER AND EMAIL THEY CAN TRACK YOU DOWN TRUST ME IT'S NOT WORTH IT [sic]"

"THEY NO WHERE U LIVE SO I HOPE U COME TO UR SENSES. THIS WILL TAKE PLACE TODAY I'M TRYIN TO SEE IF WE CAN FIGURE IT OUT. [sic]"

75.     Defendant JANVIER continued with threats, "…JOSH [JACKSON] IS NOT GONNA LET THIS SHIT GO TRUST ME!"

"U MIGHT THINK IT'S A GAME AND CAN ACT SURPRISED BUT IT WILL GET MORE SERIOUS AS THE DAY GOES ON!"

"I DON'T KNOW IF U DID THIS BEFORE BUT THESE ARE THE TYPE OF NIGGAS THAT WON'T TAKE THAT TYPE OF LOSS."

"WE HAVE UR ADDRESS I TOLD THEM TO GIVE ME TIL NOON BEFORE THEY GO TO NEXT STEP."

76.     By around 11:07 a.m., Plaintiff began receiving threatening texts, this time from an unknown number, belonging to Defendant DOE, falsely accusing her of stealing a watch from Defendant JACKSON's room.

77.     Defendant DOE texted Plaintiff: "I'M READY TO PULL UP ON U, THIS IS GOING TOO FAR,"

"YOU DON'T WANT TO DO THIS,"

"YOU FINISHED," and

"YOU DO REALIZE ALL OF US HAVE YO INFO AND ADDY."

78.     DOE then recited Plaintiff's address in the text message to confirm that they knew where she lived.

79.     Plaintiff responded multiple times throughout the conversation and informing this person that she did not know what they were referring to and that she had not stolen anything.

80.     DOE continued to threaten Plaintiff with aggressive text messages such as "WHY U PLAYIN LIKE NIGGAS PLAY BOUT THEY SHIT" and

"YOU STOLE THE WATCH AND WE NOT GONE KEEP TALKING TO U, HIVE [sic]
THAT SHIT UP."

81.     DOE continued their threatening messages: "YOU FINISHED" and

"STOP LYING TO NIGGAS U STOLE, AIN'T NOBODY BEEN IN THERE BUT U,
BUT U GONE FIND OUT THE HARD WAY I GUESS."

82.     DOE kept sending threatening messages, "DON'T MATTER, JUST KNOW I
KNOW WHO U ARE AND U PUT YOSELF IN A BAD POSITION."

83.     DOE went on, "YOU DO REALIZE ALL OF US HAVE YO INFO AND ADDY."

84.     Around 2:00 p.m. that afternoon, Plaintiff was in her apartment falling asleep when
her dog started barking loudly at her door.

85.     Apparently Torres had given Defendant JACKSON or someone close to him,
possibly one of the co-Defendants in this case Plaintiff's full address including her apartment
number.

86.     Plaintiff heard the door to her apartment being opened even though it was locked.

87.     Two imposing, hoodie-clad female individuals, Defendants DK and FK entered
Plaintiff's bedroom after breaking into Plaintiff's apartment through her front door.

88.      One of the intruders' hands was in her pocket holding what looked like a gun.

89.     Plaintiff, who was scared for her life, believing that she was about to be murdered
in her bed, was shocked and could not move.

90.     Defendants DK and FK are sisters.

91.     One of the intruders said to Plaintiff, "JOSH JACKSON SENT US. WHERE IS
THE WATCH?! JOSH WANTS COLLATERAL."

92.     One of the intruders forcefully grabbed Plaintiff's cell phone from her hands so she could not call for help.

93.     The intruder who took Plaintiff's phone ran out of the apartment and exited the building, while the remaining Defendant/intruder started grabbing and stealing Plaintiff's handbags.

94.     By this point Plaintiff got up out of bed, only wearing a bra and leggings, and began struggling with the remaining intruder clutching onto Plaintiff's handbag when the remaining intruder grabbed the handle of the handbag and pulled Plaintiff out of her apartment as she clung to the valuable handbag.

95.     Plaintiff was screaming for help and banged loudly on a neighbor's apartment door as she was being pulled out into the hallway.

96.     Plaintiff screamed, "HELP ME, HELP ME, I AM BEING ROBBED!"

97.     The intruder, still holding on to Plaintiff's handbag pulled Plaintiff into the elevator.

98.     The intruder pulled Plaintiff out into the lobby and two doormen tried to tackle the intruder/Defendant as they could see Plaintiff was being assaulted and violently robbed.

99.     The other intruder/Defendant was outside waiting in the running getaway car when her partner, the other intruder yelled at her, "COME HELP, COME HELP!"

100.    The intruder who went to retrieve the car, ran back into the building to help her accomplice escape.

101.    The doormen tackled both Defendants DK and FK and pinned them down as approximately 6-7 uniformed NYPD officers arrived at the scene and helped to subdue the intruders and arrested Defendants DK and FK.

102.    One of the building's tenants gave DOE a shirt to cover herself back up after the assault and apparent armed robbery that JACKSON orchestrated.

103.    Plaintiff reported the incident to the NYPD and told them about JACKSON and how she met him the night before.

104.    Defendant JACKSON never made a police report regarding any purportedly stolen watch.

105.    Plaintiff reported the rape to the NYPD.

106.    Plaintiff later learned that the two women that broke into her apartment, Defendants DK and FK were acquaintances of JACKSON and that they had seen her at the Super Bowl party the night before.

**AS A FIRST CAUSE OF ACTION**
**<u>VIOLATION OF 18 U.S.C. §1591 AND §1595</u>**
**(Against Defendant JACKSON)**

107.    Plaintiff repeats and realleges the allegations in each of the paragraphs above.

108.    18 U.S.C. §1591 states in pertinent part as follows:

**(a)** Whoever knowingly—

**(1)** in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

**(2)** benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

109.    18 U.S.C. §1595 in pertinent part provides civil remedies for Defendant's violations of §1591.

### *"Knowingly – in or affecting interstate or foreign commerce…"*

110.    Defendant JACKSON,  paid for DOE's car service from her apartment to his hotel with the promise of $1500.

111.    Defendant JACKSON used interstate text messaging to commit his wrongful acts.

**"recruits, entices…or solicits by any means a person…"**

112.    Defendant JACKSON  messaged and called  DOE  and invited DOE to spend time together with the assumption that there would only be a hangout and time to get to know each other.

### *"knowing…that means of force, threats of force, fraud, coercion…or any combinationof such means will be used to cause the person to engage in a commercial sex act" (commercial sex act is defined as any sex act, on account of which anything of value is given to or received by any person)*

113.    Broad, expansive language is employed in Trafficking Victims Protection Act (TVPA) and its remedial provision, which permits civil actions for damages under TVPA. Noble v Weinstein, 335 F Supp 3d 504 [SDNY 2018], mot to certify appeal denied, 17-CV-09260 (AJN), 2019 WL 3940125 [SDNY Aug. 5, 2019]

114.    Defendant JACKSON knew that he would use fraud, physical force or coercion on DOE for a sexual encounter. He offered her money for a sexual act all the while assaulting her and raping her and then sending associates to cause physical violence to Plaintiff's person.

115.    Defendant JACKSON was well aware or at least under the assumption that that his success and wealth as a professional athlete was of significantenticement to Plaintiff, and

Defendant JACKSON used this to recruit and entice Plaintiff to his hotel room where he would perform sex acts and rape her.

116.    Defendant JACKSON'S offer of time spent with a professional athlete was successful in enticing and maintaining Plaintiff in his hotel room for a short time. Plaintiff felt compelled to comply with Defendant JACKSON'S acts toward her, because she was terrified that her resistance could trigger a violent response from Defendant JACKSON that could kill or seriously injure Plaintiff with his bare hands. Defendant JACKSON then used physical force to perform the sexual acts and rape Plaintiff. Defendant JACKSON knew that the promise of time spending with him or the use of his influence and notoriety would entice Plaintiff into his hotel room and knew that once there he was in a position to force the sexual activity he desired.

117.    Defendant JACKSON also tried to entice Plaintiff to come over to his hotel room for sex by offering her $1,500.

118.    Defendant JACKSON was able to force or coerce Plaintiff into sexual activity in his hotel room because of his promise of his position as a professional athlete and because of his physically imposing stature.

119.    Defendant JACKSON actively had no intention of following through with his promise of just time spent together. Instead, he used this ploy as a fraudulent means of obtaining sexual gratification.

120.    In sum, Defendant JACKSON transported Plaintiff knowingly recruiting or enticing Plaintiff, offering her something of value, knowing that he would use this offer as a means to defraud, force or coerce her into a sexual encounter. Defendant JACKSON ultimately forced Plaintiff into sexual acts.

121.    Defendant JACKSON is liable to Plaintiff under 18 USCA §§ 1591 and 1595.

## AS A SECOND CAUSE OF ACTION
## FOR ASSAULT AND BATTERY UNDER NY LAW
## (Against Defendants JACKSON)

122.    Plaintiff repeats and re-alleges each and every allegation made in this complaint as if they were set forth herein fully at length.

123.    The aforesaid occurrences and resultant injuries to Plaintiff were caused by reason of the intent, carelessness and recklessness of Defendant JACKSON did suddenly and without provocation, did physically assault and batter Plaintiff, herein causing Plaintiff to sustain damages; in that Defendant JACKSON did conduct himself in a wanton, willful, reckless and heedless manner without regard to the safety of the Plaintiff herein; in that said Defendant was physically abusive; in behaving in a disorderly manner; in using unnecessary, excessive and unlawful touching against the plaintiff; in willfully and maliciously assaulting and battering the Plaintiff herein.

124.    Defendant JACKSON intended to cause the Plaintiff to apprehend imminent harmful contact from Defendant JACKSON.

125.    Defendant JACKSON's actions caused the Plaintiff to reasonably apprehend such a contact.

126.    Defendant JACKSON did further offensively touch, assault and batter the Plaintiff without her consent.

127.    Plaintiff has been damaged thereby.

128.    As a result of Defendant JACKSON's acts of assault and battery in violation of the above statute, Plaintiff has been damaged in an amount to be determined at the time of trial.

**AS A THIRD CAUSE OF ACTION**
**FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against Defendant JACKSON)**

129.    Plaintiff repeats and re-alleges each and every allegation made in the complaint as if they were set forth herein fully at length.

130.    Defendants' behavior was extreme and outrageous to such extent that the action was atrocious and intolerable in a civilized society.

131.    Defendants' conduct was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency.

132.    Defendants caused Plaintiff to fear for Plaintiff's own safety.

133.    As a result of Defendant's acts, Plaintiff has been damaged in an amount to be determined at the time of trial.

**AS AN FOURTH CAUSE OF ACTION**
**CPLR 213-c FOR CONDUCT CONSTITUTING CRIMES UNDER NY PENAL LAW**
**§130**
**(Against Defendant JACKSON)**

134.    Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

135.    § 130.50 of the New York State Penal Law provides as follows: Criminal sexual act in the first degree 1 A person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct or anal sexual conduct with another person: 1. By forcible compulsion; or 2. Who is incapable of consent by reason of being physically helpless; or 3. Who is less than eleven years old; or 4. Who is less than thirteen years old and the actor is eighteen years old or more. NY CLS Penal § 130.50.

136.     § 130.70 of the New York State Penal Law; "Aggravated sexual abuse in the first degree" provides that "A person is guilty of aggravated sexual abuse in the first degree when he inserts a foreign object in the vagina, urethra, penis or rectum of another person causing physical injury to such person.

137.     § 213-c of the Civil Practice Law and Rules provides as follows: Action by victim of conduct constituting certain sexual offenses: Notwithstanding any other limitation set forth in this article, a civil claim or cause of action to recover from a defendant as hereinafter defined, for physical, psychological or other injury or condition suffered by a person as a result of acts by such defendant of rape in the first degree as defined in section 130.35 of the penal law, or criminal sexual act in the first degree as defined in section 130.50 of the penal law, or aggravated sexual abuse in the first degree as defined in section 130.70 of the penal law, or course of sexual conduct against a child in the first degree as defined in section 130.75 of the penal law may be brought within five years. As used in this section, the term "defendant" shall mean only a person who commits the acts described in this section or who, in a criminal proceeding, could be charged with criminal liability for the commission of such acts pursuant to section 20.00 of the penal law and shall not apply to any related civil claim or cause of action arising from such acts. Nothing in this section shall be construed to require that a criminal charge be brought or a criminal conviction be obtained as a condition of bringing a civil cause of action or receiving a civil judgment pursuant to this section or be construed to require that any of the rules governing a criminal proceeding be applicable to any such civil action. NY CLS CPLR § 213-c.

138.     Defendant JACKSON violated the sections cited herein as set forth and Plaintiff suffered numerous damages as a result.

**AS A FIFTH CAUSE OF ACTION**
**FOR VIOLATING THE NY GENDER MOTIVATED VIOLENCE PROTECTION**
**ACT**
**(Against Defendants JACKSON and NAOMI and DEGEUNE KEITA)**

139.     Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

140.     N.Y. ADC. LAW § 8-903 states in relevant part "For purposes of this chapter: a. "Crime of violence" means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction. b. "Crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.

141.     N.Y. ADC. LAW § 8-904 : NY Code – Section 8-904: Civil Cause of Action states in relevant part "Except as otherwise provided by law, any person claiming to be injured by an individual who commits a crime of violence motivated by gender as defined in section 8-903 of this chapter, shall have a cause of action against such individual in any court of competent jurisdiction for any or all of the following relief: 1. compensatory and punitive damages; 2. injunctive and declaratory relief; 3. attorneys' fees and costs; 4. such other relief as a court may deem appropriate."

142.     N.Y. ADC. LAW § 8-905 Limitations states in relevant part: "a. A civil action under this chapter must be commenced within seven years after the alleged crime of violence motivated by gender as defined in section 8-903 of this chapter occurred. . . . c. Nothing in this

section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action under this chapter.

143.   Defendant JACKSON'S conduct constitutes crimes of "violence motivated by gender" under The Victims of Gender-Motivated Violence Protection Act ("VGMVPA").

144.   Defendant JACKSON violated the sections cited herein as set forth and Plaintiff suffered numerous damages as a result.

**AS A SIXTH CAUSE OF ACTION**
**SEXUAL ASSAULT/SEXUAL ABUSE**

145.   Plaintiff repeats and reiterates all of the allegations contained in the previous counts and/or paragraphs as if set forth at length herein.

146.   Defendant, JOSHUA JACKSON, used his position of notoriety to gain access to Plaintiff, to engage in unlawful sexual contact with the Plaintiff without her consent.

147.   Defendant acted with the purposeful, knowing, reckless, negligent intent to cause harm and/or offensive contact to the Plaintiff DOE and thereby put her in imminent apprehension and fear for her life and well-being. Defendant's actions would be offensive to a person with a reasonable sense of personal dignity.

148.   Plaintiff did not and could not consent to the acts, and any purported consent was secured through fraud, deception and undue influence, coercion and duress thereby rendering it void.

149.   Defendant's actions were outrageous and constituted a wanton and reckless disregard to Plaintiff's health and well-being.

150.   As a direct and proximate result of the conduct described herein above, Plaintiff has and will continue to suffer physical injury; severe emotional distress and anguish; diminished enjoyment of life; difficulty and an inability to focus; difficulty and an inability to perform

educational and/or work related tasks; anxiety; depression; humiliation; pain in mind and body; severe embarrassment; is having and has had difficulty living a normal life; has not and will not engage in normal activities; will suffer from behavior patterns and will continue to do so in the future; will in the future be caused to endure severe pain in mind and body; has endured interference with and will continue to endure interference with engaging in her full normal daily activities. Plaintiff's self-esteem and ability to trust others has been substantially impaired, needing to obtain help and treatment from professionals and health care professionals in general and may incur medical, hospital and psychiatric expenses in amounts yet to be determined.

151.     Defendant was responsible for the sexual assault and rape of Plaintiff. Defendant acted carelessly, recklessly, negligently, and grossly negligent, and caused great harm to plaintiff by sexually assaulting and raping Plaintiff.

152.     Defendant JACKSON violated the sections cited herein as set forth and Plaintiff suffered numerous damages as a result.

## AS A SEVENTH CAUSE OF ACTION
## FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
### (Against all Defendants)

153.     Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

154.     At all relevant times, Plaintiff is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

155.     At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

156.    18 U.S.C. § 1962. Section 1962(c) of the act renders it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Congress passed RICO in 1970 with the broad aim of eradicating organized crime and corrupt business activity, proclaiming the statute's provisions "shall be liberally construed to effectuate its remedial purposes." Organized Crime Control Act of 1970, Pub. L. No. 91–452, § 904(a), 84 Stat. 922, 947 (1970); *see also, e.g.*, Boyle v. United States, 556 U.S. 938, 944, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009); United States v. Turkette, 452 U.S. 576, 587, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

157.    At all times material, Defendants were not only perpetrators under RICO but also conspirators under RICO. Those who conspire to violate RICO also fall within the statute's broad purview. 18 U.S.C. § 1962(d). And the statute provides civil remedies to "[a]ny person injured in [her] business or property by reason of" the enterprise's racketeering activities, permitting the recovery of treble damages and attorney's fees. 18 U.S.C. § 1964(c). Kruse v. Repp, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *16 (S.D. Iowa Mar. 20, 2020)

158.    To state a claim under § 1962(c), Plaintiff must plead facts that, if proven, demonstrate "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." Salinas v. United States, 522 U.S. 52, 62, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). Kruse v. Repp, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *16 (S.D. Iowa Mar. 20, 2020)

159.    At all times material, Defendants were an enterprise under RICO.

160.    At all relevant times, the enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. §1962(c).

161.    At all times material, Defendants are each a "legal entity" and therefore an "enterprise under the RICO Act. A RICO "enterprise" is the vehicle through which a defendant conducts an unlawful pattern of racketeering activity, Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), and is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1961(4); see also Turkette, 452 U.S. at 581–82, 101 S.Ct. 2524 (describing two categories of enterprises: "legal entities" and associations). But "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." Turkette, 452 U.S. at 583, 101 S.Ct. 2524. Rather: The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. Kruse v. Repp, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *16–17 (S.D. Iowa Mar. 20, 2020). The ultimate inquiry is "whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense." Diamonds Plus, Inc. v. Kolber, 960 F.2d 765, 770 (8th Cir. 1992). Thus, to state a claim under § 1962(c), a complaint must allege the existence of an enterprise that "would still exist were the predicate acts removed from the equation." Crest Const. II, 660 F.3d at 354–55 (quoting Handeen, 112 F.3d at 1352). Kruse v. Repp, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *17 (S.D. Iowa Mar. 20, 2020) "Legal entities are garden-variety 'enterprises' which generally pose no problem of separateness from the predicate acts." Bennett v. Berg, 685 F.2d 1053, 1060 (8th Cir. 1982); see also id. ("An enterprise is particularly likely to be found where ... the enterprise alleged is a legal entity rather than an

'associational enterprise.' "). <u>Kruse v. Repp</u>, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *17 (S.D. Iowa Mar. 20, 2020).

162.    At all times material DEFENDANTS were an enterprise in that they were a "group of individuals associated in fact." An association-in-fact enterprise consists of "a group of persons associated together for a common purpose of engaging in a course of conduct" and is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." <u>Boyle</u>, 556 U.S. at 944–45, 129 S.Ct. 2237 (quoting <u>Turkette</u>, 452 U.S. at 580, 583, 101 S.Ct. 2524). Though § 1961(4) "does not specifically define the outer boundaries of the 'enterprise' concept," the idea behind an enterprise comprised of "any union or group of individuals associated in fact" is quite "obviously broad": "The term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." <u>Id.</u> at 944, 129 S.Ct. 2237 (citation omitted). At its core, "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." <u>Id.</u> at 948, 129 S.Ct. 2237. <u>Kruse v. Repp</u>, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *17 (S.D. Iowa Mar. 20, 2020) The requisite structural features of an actionable association-in-fact enterprise, <em>See</em> <u>Boyle</u>, 556 U.S. at 945–46, 129 S.Ct. 2237, "In the sense relevant here, 'structure' means '[t]he way in which parts are arranged or put together to form a whole' and '[t]he interrelation or arrangement of parts in a complex entity.' " (citing American Heritage Dictionary 1718 (4th ed. 2000))). The first of these, a common <em>purpose.</em> <u>Kruse v. Repp</u>, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *18 (S.D. Iowa Mar. 20, 2020). The second structural feature, <em>relationships among those associated with the enterprise</em>, <u>Kruse v. Repp</u>, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *18 (S.D. Iowa Mar. 20, 2020). The enterprise's <em>longevity</em>, the third structural characteristic of an

association-in-fact enterprise. Kruse v. Repp, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *18 (S.D. Iowa Mar. 20, 2020)

163.    At all times material the Defendants had a common purpose of raping and sexually assaulting Plaintiff, silencing Plaintiff about her rape, and robbing and assaulting her, and threatening her physical safety because of the rape and because she confronted Defendant JACKSON about the rape. There exists relationships among these Defendants, and there exists longevity in their "enterprise."

164.    At all times material Defendant JACKSON's co-Defendants were accomplices after-the-fact and accessories after-the-fact of Defendant JACKSONS rape and sexual assault of Plaintiff.

165.    At all times material Defendants were accomplices and accessories of each other's home-invasion robbery, assault and battery, rape, sexual assault, unlawful threats upon and harassment of Plaintiff.

166.    At all times material Defendants engaged in a pattern of racketeering activity under RICO. A " 'pattern of racketeering activity' requires at least two acts of racketeering activity," with the last occurring within ten years of another prior act. 18 U.S.C. § 1961(5). Congress has defined "racketeering activity" to include a panoply of federal and state crimes. See id. § 1961(1). Civil liability does not hinge on a RICO defendant's conviction of the predicate acts forming the basis of a racketeering allegation. Sedima, 473 U.S. at 493, 105 S.Ct. 3275. The "pattern" requirement is quite flexible, too. H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 238–39, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Kruse v. Repp, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *20 (S.D. Iowa Mar. 20, 2020).

167.    The Defendants' pattern of racketeering activity is demonstrated by the following crimes as stated above and as covered under 18 U.S.C. 1961(1): Section 1591 relating to sex acts committed against Plaintiff as covered by section 1591, as well as robbery, burglary, criminal trespass, assault and battery, and criminal harassment us defined under all applicable provisions of the N.Y. Penal Law, including but not limited to N.Y. Penal Law Articles 130, 140, 160 and 240.

168.    18 USCA § 1595. (a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

169.    All of the above predicate acts are related and amount to or pose a threat of continued criminal activity. A RICO plaintiff must plead facts that "show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity," evidencing some "continuity plus relationship which combines to produce a pattern." H.J. Inc., 492 U.S. at 239, 109 S.Ct. 2893 (emphasis omitted) (second quote citing 116 Cong. Rec. 18940 (1970) (Sen. McClellan)). "Prohibited activities are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Handeen, 112 F.3d at 1353 (quoting H.J. Inc., 492 U.S. at 240, 109 S.Ct. 2893). Much like establishing an association-in-fact enterprise, "these two constituents of RICO's pattern requirement must be stated separately, though in practice their proof will often overlap." H.J. Inc., 492 U.S. at 239, 109 S.Ct. 2893. Kruse v. Repp, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *22 (S.D. Iowa Mar. 20, 2020)

170.    The above illegal activities also amount to or pose a threat of continued criminal activity, "Continuity" is both close-ended and open-ended, the former "referring either to a closed period of repeated conduct" and the latter demonstrated by "past conduct that by its nature projects into the future with a threat of repetition." Id. at 241, 109 S.Ct. 2893. To plead close-ended continuity, a plaintiff in this circuit must state facts that establish "related acts continuing over a period of time lasting at least one year." Crest Const. II, 660 F.3d at 357 (citing citation omitted); see H.J. Inc., 492 U.S. at 242, 109 S.Ct. 2893 (requiring "a series of related predicates extending over a substantial period of time"). Alternatively, a plaintiff must plead open-ended continuity by showing that "the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." H.J. Inc., 492 U.S. at 242, 109 S.Ct. 2893. But "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." Id. Ultimately, whether the predicates alleged demonstrate a threat of continued racketeering activity "depends on the specific facts of each case." Id. Kruse v. Repp, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *22 (S.D. Iowa Mar. 20, 2020). The above illegal acts occurred over a period of time lasting at least one year. The above illegal activities also involve a direct threat of long-term racketeering activity.

171.    Defendants are also liable under a RICO conspiracy. Section 1962(d) makes it unlawful for any person to conspire to violate RICO's substantive provisions. To state an actionable RICO conspiracy, a plaintiff must plead facts that show (a) "an enterprise existed"; (b) "the enterprise affected interstate or foreign commerce"; (c) "the defendant associated with the enterprise"; and (d) "the defendant 'objectively manifested an agreement to participate ... in the affairs of [the] enterprise.' " Aguilar v. PNC Bank, N.A., 853 F.3d 390, 402 (8th Cir. 2017) (alterations in original) (quoting United States v. Darden, 70 F.3d 1507, 1518 (8th Cir. 1995)). In

accordance with general conspiracy principles, and contrary to the Bank Defendants' position, there is no requirement that any one conspirator itself agree to commit a predicate act in furtherance of the conspiracy because, "so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators." Salinas, 522 U.S. at 64, 118 S.Ct. 469; see also id. at 65, 118 S.Ct. 469 ("The interplay between [§ 1962] subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense."). Thus, a RICO conspirator must simply "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Id. at 65, 118 S.Ct. 469. To that end, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense" so long as "[t]he partners in the criminal plan ... agree to pursue the same criminal objective." Id. at 63, 118 S.Ct. 469; see also United States v. Kragness, 830 F.2d 842, 860 (8th Cir. 1987) ("RICO conspiracy law, like traditional conspiracy law, requires only that each defendant agree to join the conspiracy ...."). A civil RICO plaintiff "need only establish a tacit understanding between the parties, and this may be shown wholly through the circumstantial evidence of [each defendant's] actions"; proof of an express agreement is not required. Aguilar, 853 F.3d at 402 (alteration in original) (citation omitted). But pleading a RICO conspiracy requires more than stating facts showing the defendant merely associated with co-conspirators, knew about the conspiracy, and was present during conspiratorial discussions. Rosemann v. St. Louis Bank, 858 F.3d 488, 500 (8th Cir. 2017). Rather, a plaintiff must demonstrate "that the defendant was aware of the scope of the enterprise and intended to participate in it." Aguilar, 853 F.3d at 402 (citation omitted). Kruse v. Repp, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *24–25 (S.D.

Iowa Mar. 20, 2020) An enterprise existed among Defendants. The enterprise affected interstate or foreign commerce. The Defendants associated with the enterprise, and the Defendant objectively manifested an agreement to participate ... in the affairs of the enterprise.

172.    Plaintiff has RICO standing. RICO provides civil remedies to "[a]ny person injured in [her] business or property" by reason of the statute's substantive provisions to sue for treble damages caused by the enterprise's racketeering activities. 18 U.S.C. § 1964(c).

173.    A plaintiff has standing to bring a civil RICO claim "if, and can only recover to the extent that, [she] has been injured in [her] business or property by the conduct constituting the violation." Sedima, 473 U.S. at 496, 105 S.Ct. 3275; accord Gomez v. Wells Fargo Bank, N.A., 676 F.3d 655, 660 (8th Cir. 2012) ("To have standing to make a RICO claim, a party must have 1) sustained an injury to business or property 2) that was caused by a RICO violation." (citation omitted)). The alleged RICO violation must be the proximate cause of the plaintiff's injury, that is, there must be "some direct relation between the injury asserted and the injurious conduct alleged." Holmes v. Sec. Inv. Protection Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). To maintain a civil RICO conspiracy claim, moreover, a plaintiff's injury must derive from an act made unlawful under the statute itself: As at common law, a civil conspiracy plaintiff cannot bring suit under RICO based on injury caused by *any* act in furtherance of a conspiracy that might have caused the plaintiff injury. Rather, consistency with the common law requires that a RICO conspiracy plaintiff allege injury from an act that is analogous to an 'ac[t] of a tortious character,' meaning an act that is independently wrongful under RICO. Kruse v. Repp, No. 419CV00106SMRSBJ, 2020 WL 1317479, at *26 (S.D. Iowa Mar. 20, 2020).

174.    The Defendants violations of, among others, Sex Acts By Force (18 USC 1591) directly caused economic injury to Plaintiff. These violations specifically targeted the Plaintiff. Plaintiff was the actual target of these illegal activities and thus has proper standing.

175.    Plaintiff has incurred attorneys fees, healthcare provider fees, and other economic loss as a result.

176.    Accordingly, Plaintiff has been damaged in an amount to be determined at the time of trial for all available damages under RICO.

WHEREFORE, Plaintiff DOE requests judgment for compensatory damages, reasonable attorneys' fees and punitive damages against Defendants JOSHUA JACKSON, DEGUENE KEITA, FATOUMATA KEITA a/k/a NAOMI KEITA, JEOFFREY JANVIER and JOHN DOE jointly and severally, pursuant to 18 U.S.C. §§1595, 1962, the other statutory provisions cited herein, the common law, the laws of the State of New York and all applicable laws, and such other and further relief as is just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues so triable.

Date: June 12, 2023

*Respectfully submitted,*

**DEREK SMITH LAW GROUP, PLLC**

Seamus Barrett, Esq.
One Penn Plaza, Suite 4905
New York, New York 10119
212.587.0760